The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Robert J. Steigman presiding. Thank you, Mr. Clerk. This is case number 4, 19-0245, people, State of Illinois v. Jerome Harris. For the appellant, counsel, would you please state your name? Amy Kemp. Thank you. And for the appellee, counsel, please state your name. Josh Schneider. Okay. Ms. Kemp, you may proceed at this time. Good afternoon. My name is Amy Kemp. I work at the Office of the State Appellate Defender, and I represent the appellant, Jerome Harris, in this matter. In March 2007, at a duplex apartment on Danville's Main Street, three people were shot and killed. The state gathered a wealth of physical evidence from the murder scene, none of which placed Harris at the scene. The physical evidence, rather, almost conclusively placed Fredel Freddy Moe Bryant, a gang general, and Shane Shug Savage, the boyfriend of one of the three dead at the scene. Ashley Brown, a young woman who lived in the duplex apartment next door, told police just a few days after the murders that she heard the voices of the three people who were killed and two unidentified male voices through the wall that separated the two apartments. She did not so much as mention Harris. Savage, too, was twice interviewed by police just after the murders, and he, too, said nothing about Harris. More than five months later, Brown was arrested,  Almost four years later, Savage was arrested, and he changed his story to implicate Harris in the murders. Meanwhile, the state collected jailhouse informants James Mosley, Albert Britt, and Richard Bell, who would claim, at times when they themselves were facing or anticipating criminal charges,  The state ultimately tried Harris for three murders committed some seven years before, building a house of cards with the testimony and prior statements of these five unreliable witnesses, each precariously propping up the others. Credibility was the only basis on which this case could be decided, and the contest of credibility was skewed in the state's favor by the cumulative effect of the trial court's and defense counsel's errors. It is the jury's job to make credibility determinations, and the errors here interfered with its ability to do that. Due process, therefore, demands a new trial. Consider the five witnesses, one by one. Ashley Brown. In late March of 2007, just a- Counsel, let me interrupt. I was going to say this at the end, I'll say it at the beginning. I'm very impressed by the brief you wrote, and by the brief Mr. Schneider wrote, on behalf of the people. You did a very thorough job, and I thank you for it. This is obviously a complicated, involved case, but the reason I'm interrupting you now is to mention that we're familiar with it. We're familiar with the facts. We're familiar with what you set forth well in your brief, and what I wanted to do is go to some other questions of law to have you respond to those, as opposed to essentially reiterating what you've already well said in your briefs. Particularly, I'll tell you the area that's my biggest concern, so Mr. Schneider can address it as well, is the limitations of the trial court on the cross-examination of Mosley. And what I'm trying to understand is the precise context in which this happened. This is a person who was a key witness, who essentially was testifying to, if not confessions, seriously inculpatory admissions made by the defendant in this case. And I'm trying to understand how these limitations on cross-examination of Mosley concerning his expectations, or the deal, or the circumstances, what he hoped to gain by testifying, where these limitations came from. It seemed, am I correct, that the state objected prior to trial concerns that the defense might pursue this in too much detail? Yes, my recollection is that defense counsel made a motion to expose witnesses' motives, something, I can't remember the exact phrasing, but I believe that's how the motion was termed, both as to Mosley and other state's witnesses who had motive to fabricate. And at that time, the state essentially represented that it hadn't made any promises in exchange for cooperation or testimony. And the court made these pretrial rulings that promises could be explored on the stand, promises of leniency, promises of favor, but nothing else. So that's the context of the leader. Was this because the state objected to going any further? I'm trying to remember that. And it seemed to me like a trial court made it clear she was imposing limitations in just how far the defense could go. Is that correct? Yes, I believe that the state essentially took the position that only promises were relevant. So long as it hadn't promised anything, then nothing else was relevant. With the exception of the money that it paid to Mr. Mosley, it did disclose that and seem to agree that that money was relevant, the food and housing and the medical care that he was provided around the time of trial. But also, was there also some question that was raised because there was charges in Champaign County that the prosecutor said that's not something which should be capable of being cross examined about? Yes, I believe in the sidebar discussions on during Mr. Mosley's testimony on cross examination when defense counsel was trying to get into this area on Champaign County 749 is how I termed it in the briefing. The state took the position that because it was a Champaign County case, Vermillion County couldn't have possibly promised or given him anything in exchange for his cooperation. Therefore, the Champaign County case was not relevant. That's the position the state took. And the trial court seemed to accept it. The reasoning isn't completely clear from the record. But it's clear that defense counsel wanted to get into Champaign County 749, not for purposes of saying Mosley's a bad guy or Mosley sold drugs on a school school. The defense attorney vigorously argued against that ruling that you know, if I remember correctly, and argued that she should be able to explore fully all of his thinking about this. That is Mosley's thinking. Yes, I believe. Unless my recollection fails me, I believe it was Dan Taylor at this point, who did the argument on behalf of defense, and he did argue that he needed to be able to get into the complicated procedural history of 749 to show how the timing lined up. It's for this reason that I provided a timeline in my brief, because it is it is complex. He pled guilty before he was even incarcerated with Mr. Harris, and his motion to withdraw a guilty plea in 749 wasn't granted until after he was incarcerated with Mr. Harris. So there's this gap in time between when he supposedly had a conversation with Mr. Harris and when he reported it. And in that intervening gap of time is when he was permitted to withdraw his guilty plea and again, faced the criminal charges in 749 and criminal charges in other cases that had also been dismissed pursuant to the plea that was withdrawn. Well, one argument is he did get concessions in Champaign County. Is that right? No, that's not the argument. The argument I don't understand. The argument is that the jury needed to hear the the timeline of what occurred in 749 in order to understand why Mr. Mosley would have had a motive to write that letter implicating Mr. Harris more than a year after the supposed confession that he heard. And that motive was whether it was true or not, Mosley would have thought that he could benefit in his Champaign County case by cooperating in this Vermillion County case. And I think it's telling that later in cross-examination, defense counsel tried to get at a meeting that Mosley had with the Vermillion County state's attorney, where the defense counsel asked him whether he had requested a recognizance bond in a Champaign County case from the Vermillion County state's attorney. Now, Mr. Mosley, of course, danced around that question and said, well, I don't think I did. But if I did, what he told me was he couldn't do it because he's Vermillion County and not Champaign County. But that meeting was in 2011. And we're talking about what was Mr. Mosley's motive in 2008 when he, excuse me, 2009, when he wrote that letter, the first implication of Mr. Harris. I think it's really important to tease out the impeachment of Mr. Mosley as a witness, which was certainly abundant. Defense counsel did get at many reasons why Mr. Mosley's testimony shouldn't be believed. But defense counsel was prevented from getting at this motive for the letter, which was the very first implication. It was five years before trial. Why would Mr. Mosley make up the accusation in the first place? The jury wasn't... Was this issue briefed to the trial court? Did they submit authority on point about the scope of cross-examination of Mosley? As I said, there was that motion, the pre-trial motion to expose witnesses' motives. At this point, it would be difficult for me to tell you how in-depth the authority and argument was in that motion, as opposed to the kind of forum motion. But there were certainly arguments in court, both pre-trial and then during, out of the jury's hearing. The reason I emphasize this is I just don't understand what the trial court could possibly have been thinking. I'll be asking Mr. Schneider about it, but this court wrote 2011 in Dobson that a criminal defendant is virtually unrestricted in her ability to cross-examine witnesses regarding their expectation of leniency in exchange for their testimony, that such cross-examination should be thorough and unconstrained. And as another court put it, that the key factor is not the existence of actual pressure, but the witness's state of mind. Given how important this witness is, and of course, it's not as if, as Mr. Schneider points out, the jury doesn't know what a bad guy Mosley is, but the question is, what was he thinking? What was he hoping to gain? And I don't understand why the state given all of this created problems and how the trial court could possibly have thought that the limitations it imposed were appropriate. I think there was a fair bit of confusion in this case because of the long passage of time, because of the sheer number of prior statements by each of the witnesses where stories are changing, you're getting different iterations of stories over time. And quite frankly, I think the trial court, and maybe the attorneys to a certain extent, got confused about impeachment of testimony versus impeachment of prior statements, and why in this case, impeachment of prior statements was so very important. Not just as to Mr. Mosley, but also as to Ashley Brown, where she got on the stand and said that she didn't remember whether she heard Harris's voice in the apartment and didn't see the face of a man leaving the apartment. So the only thing the state had from Ms. Brown was her prior inconsistent statement, which was substantively admissible. We can see the substantive admissibility of that prior inconsistent statement, her reported police statement in September of 2007. But defense counsel failed to try to reveal Ms. Brown's motive to fabricate that statement, which is that she was arrested immediately before giving the statement. And she was released without criminal charges immediately after giving that statement. And she gave that- You're claiming that as a basis for ineffective assistance too? Yes. Well, to say she was arrested and in custody, doesn't that suggest that she had motive to try to make the police and prosecutors happy with just that information that she was arrested and in custody? Yes. And I think it's particularly telling that Ms. Brown, when she was interviewed by police a few days after the murders, she was interviewed at her home, she was not under arrest, and she did not implicate Mr. Harris. She did not mention Mr. Harris. My point is, what was it, the criminal trespass she was arrested for? So that's what the record indicates. Well, the point is, couldn't a reasonable defense attorney at trial think that, I'll let it hang that she was in custody and arrested and wanted to make the police and prosecutors think well of her, because of the consequences if they didn't. And the consequences, if unspoken, might be viewed by the jury as greater than if spoken as being this criminal trespass, which is a minor misdemeanor. Justice Stegman, the jury did not hear that she was in custody. The jury never heard that she was arrested. No, the jury never heard that she was arrested. This is something that the state has represented in its brief, but it's incorrect. The jury never heard that she was arrested. The jury heard that she was at the PSB for quote unquote, something else. The state's attorney also gave the euphemism of, you were there to give your statement, I believe. I wish I had the exact quote in front of me. But the jury only heard these euphemisms of something else. They were not told that she was arrested. They were not told that she was in custody. So it's not that the jury didn't hear what she was in custody for. It's that the jury never heard that she was in custody at all. Let me ask this other question. Other than Mosley, are there any other limitations on cross-examination of state's witnesses? And I guess, Bronwyn just mentioned that you are complaining about on appeal? No. Okay. So then your other primary objection, if I understood correctly, deals with the counsel for not objecting to prior consistent statements, and in some instances, how prior inconsistent statements were elicited? Yes. The evidentiary issues with all of the witnesses, except for Brown and Mosley. So Britt, Bell, and Savage. That all of them had either prior consistent statements that were admitted to improperly bolster credibility and or prior inconsistent statements that were inadmissible for any purpose, including impeachment, and yet were read into the record verbatim from transcripts. And in the case of Britt, the state's attorney even quoted the prior inconsistent statement in closing argument and urged the jury to rely on it as substantive evidence. So these were... Why wasn't it admissible substantive evidence? There was no personal knowledge from these witnesses. These were the jailhouse informant witnesses. They didn't have personal knowledge as defined in the case law, which is not personal knowledge of the alleged conversation with the defendant. It has to be personal knowledge of crime itself. Well, they could testify directly to the conversations to the extent they did that, can't they? They can testify regarding the conversations, absolutely. Okay, so what you're saying is the state went beyond that to introduce prior inconsistent statements that included references to things the defendant said that weren't testified to directly? Yes, the state read large portions of transcribed police statements by Britt and Bell into the record. In the case of Britt, he was unable to provide very many details during his testimony. He said he didn't remember. And so the state, instead of being able to use the testimony that it wanted to use, it then pulled out these transcripts from his prior police statement and started reading whole chunks of the transcripts into the record. And again, under Supreme Court case law, Simpson clearly defines the personal knowledge required for substantive admissibility of prior inconsistent statements as personal knowledge of the crime, not the conversation. So those transcripts were not admissible as substantive evidence, and they weren't admissible even as impeachment material because these were state's witnesses. There was no affirmative damage. So for these chunks of transcript from Bell and Britt's prior inconsistent statements, there was no lawful purpose that they could be used for. And yet, the state is asking the jury to use them as substantive evidence. Bell got on the stand, and he suddenly said to the jury, well, Harris didn't really confess to me, he just reported to me what other people were saying about him. So Bell didn't even relay a confession in his testimony. So because the state wanted that jailhouse informant that it expected, it pulled the transcript from his prior police statement and read from it, and gave the jury this. Let me ask the counsel, it appears from through most of this really complex case, the defense is doing a pretty thorough job. And for instance, with regard to the arguments on the impeachment efforts and cross examination of Mosley, is there, in raising ineffective assistance of counsel and direct appeal, the question comes up as to, given how sound the job the defense was doing generally, is there some theory or possible strategy the defense might have had for letting this in or not emphasizing it? Some of the reasons Mr. Schneider addressed, which might suggest that this is one of those cases where before we conclude that defense counsel was ineffective, we should say that this is a matter for a post conviction petition, so that a record can be made and counsel could be asked and counsel could explain why counsel did what she or he did. I guess there were multiple defense counsel or failed to do. What about that? I see my time has expired. If I may briefly respond. Yes, I'm anxious to hear your answer. Thank you. I have two responses to that. The first is that we're not just dealing with ineffective assistance here, we have the combination of ineffective assistance and trial court errors. And so we have to look at the cumulative effect of all of that. As to strategy... Pausing right there. I want to make sure I understand which trial court errors other than the failure to permit the defense to cross examine mostly in detail are you referring to? The Zaire issue is also kind of a background contributing error to the cumulative error here. Okay, go ahead. The second point more directly to your question about whether there could have been a strategic basis that defense had for allowing in these chunks of transcripts. The record doesn't disclose any possible strategic basis where you have witnesses who are just so unbelievable largely you have Bell backing off the alleged confession he received, you have Britt very reluctant on the stand. Let me clarify my question. You're right, the record may not re-establish it. But should we entertain the idea of sending the case back so the record could establish? Is there some possible explanation that defense counsel could provide? I don't believe so here where you have such a pervasive pattern of interrelated errors, they all go to credibility and every one of these five witnesses is touched by at least one error, if not more. Thank you. Thank you, counsel. Mr. Schneider, you want to make your argument on behalf of the appellate? May it please the court, counsel. I'm, as the court noted, Assistant Attorney General Josh Schneider on behalf of the people of the state of Illinois. I'll start with the cross-examination issue. First, I'll provide the court with just some record sites so that we're all on the same page, know where to find this. The motion eliminated that defense counsel filed regarding presenting evidence of interest, bias, and motive is common law record is C-294 to 296. It doesn't include any citation to Illinois case law. And I would note that when the motion eliminated was discussed in court, this is at R-404, the trial court actually reserved ruling. And so I'll deal with it when it comes up. Certainly, I'll, you're allowed to ask if anything's been promised and whether their convictions are relevant to the extent of the credibility issue, but I won't let you get into the specifics of their prior convictions ad nauseam. So just pausing right there. How can that possibly be correct? I mean, I just read you some quotes from what this court wrote in Dobson about should be thorough and unconstrained. How criminal defendant is virtually unrestricted in our ability to cross-examine witnesses regarding the expectation of leniency and testimony, which you just said in further remarks about it. I'm not going to let you go beyond that. I think the court said, this just seems to be the clearly error. I'm a serious guy. I would note the court does not actually say, I'm not going to let you go beyond that. It just, oh, I'm not like going to the specifics of their prior convictions ad nauseam is what the court said. And certainly I don't think that it is anything controversial to say that trial court has the discretion to limit cross-examination when it borders on ad nauseam. If for example, they wanted to hammer away at the specifics of what he had been charged with, even though that is obviously the, whether he faced a serious charge is something that is relevant to whether he had bias or interest or motivation to come forward. They didn't get, they didn't get to hammer away. They didn't even get to take out their tack hammer to make a lightly tap light tap. Well, I would direct the court. I think that defendant characterizes what he was actually trying to elicit very clearly on page 59 of his brief. The question he wanted to get at was, was there a reason for Mosley to volunteer this letter when he did? Essentially, was he facing charges? And counsel just never asked that question. He wasn't restricted from it. And when the court, so he asked, well, were you sentenced to 20 years? Yes. And it was originally 20, it was a deal, no more than 25. You actually got 20 years. Yes. Then he was asking about the sentence again and the court, the state objected and the court said, yeah, you've already gone through this. He never actually asked the question, when you sent your letter, were you facing charges? And that's the question that he's not allowed to ask. He just never. Well, no, there's more to that was just the beginning. I mean, it doesn't have to be facing charges. The, as the court said, it's not a matter of the existence of actual pressure, but the witness's state of mind. That's what should be on a case like this. When a guy is talking about the, with a terrible criminal record, he's got, why is he pointing the finger at the defendant in this case, in this murder case, the defendant should be able to probe literally anything and everything. I mean, if there ever was a poster boy for no, a limit, a limitless cross-examination, it should have been this case and the defense cross-examination of Mosley. Well, your Honor, I would note that, that the reason that I'm focusing on this is that this is the claim that defendant has chosen to raise. Defendant has articulated the limitation on his cross-examination as not being permitted to explore the chronology of whether Mosley was such that he had a motivation to, to fabricate a story against defendants. So of course, that's the claim that he's chosen to present. That's the claim that we responded to. And he just didn't ask the chronology question. He didn't make a record. You're suggesting if he asked the right question, the trial court would have said, oh, well, okay, I'm going to change my earlier indication. You're not going to be permitted to do this. I respectfully, your Honor, just looking at page R404, I don't see an indication from the court that would not have let him ask that question. I certainly would not be comfortable presuming that the court would err in that way, where it hasn't given us a strong indication to believe that it would have done so. But ultimately, it just boils down to what? We've lost you. Oh, I'm sorry. We better go back for the last 20 seconds. Oh, dear. So I think what I was saying 20 seconds ago was the question that counsel is saying, or that defendant is saying he was not allowed to ask, but he wanted to ask, was whether Mosley was facing charges at the time that he sent this letter, such that he had a motivation to send the letter. And that question is not a question that he asked. And he didn't make an offer of proof that that was what he was trying to ask. He asked a series of questions about the sentence that Mosley had originally received, but had subsequently been vacated, which didn't go to that point. And then he subsequently started to ask the question. The state objected on the line that it was along the same lines of the previous line of questioning about just the sentence he'd received had been vacated. And he didn't say, no, no, that's not what I'm asking. I'm actually trying to ask this. He never made the offer of proof that have allowed the court to determine whether this was the question that he now faults the court for not allowing him to ask. So really it's just, we just don't have a record to find that there was the restriction that he faults the court for making. The court doesn't make that restriction at page R-404. It expressly reserves room for when it comes up and says, I'm not going to let you go into the specifics ad nauseum to take that for what it means, but you need to be careful in that area. That doesn't really pose any restriction. It says we're going to address it when it comes up. And then when it comes up, I want to make sure I understand you're saying that the defense argument is at least diminished by the fact that no offer of proof was made to establish what Mosley would have testified to on cross-examination had the state permitted the defense to pursue this at greater length. And that's correct, Your Honor. But not just that he's not making offer of proof as to what Mosley would have testified, but the second objection that the state made after the first round of objections was in the middle of a question. So we don't actually know what the rest of that question was. Counsel could have said, no, no, I'm not asking about this. I'm asking about this. And then the court would have known, oh, he's now asking about the chronology rather than just continuing to ask about the sentence. By not even if he was not sure what they would elicit, it would then have been clear to the trial court, oh, he's directing it at the chronology. If he said, I'm going to ask, when you were asked, when you sent the letter, you were facing charges in Champaign County, weren't you? That would have plainly been directed at bias or motive. And then had the trial court said, I'm not going to let you ask that, we'd be in a very different position. But that's not the position we're in because that record was just never made. We just don't know what questions defense counsel would have asked because he never made any offer to the court. He just abandoned the line of questioning and moved on. Let me ask you about the other point Ms. Kemp made, and that is, for lack of a better way to put it, the very peculiar direct examination that the state conducted of its own witnesses in this case. I'm very familiar with prior inconsistent statements and prior consistent statements around the rest of that. And the way things are supposed to work is the state has questions of its witness and here's an answer. And if the answer is different from a statement made, prior inconsistent statement that has indicia of admissibility in the statute, then the witness is either acknowledges it or doesn't, in which case then the state has to call some other witness to bring it forth. Or one of the other things, if the witness testifies consistently with the earlier statement, then the earlier statement is of no moment. It's a prior consistent statement and is not to be testified about except when they're very limited circumstances. It seems like these rather straightforward rules were rather entirely abandoned by the prosecutors in this case. And I'm trying to figure out what was going on and what the trial court was thinking, what defense counsel was thinking. What's your take on this Mr. Schneider? I think it is, your honor is asking about Britt and Bell's direct examination. Primarily, but I've seen a lot of others as well, that the rules that just described were deemed apparently as mere conveniences, if that. Well, your honor, Britt and Bell were the ones that were confronted with their prior police statements. To my knowledge, Mosley and Savage and Brown were not. But it's important to remember that the claims that are being raised by, now we've talked about whether something is or is admissible under this rule or that rule, but the claims that are being raised are not evidentiary claims. They are ineffective assistance claims. So the question is not, was this particular evidence objectionable? It's whether counsel made a reasonable strategic decision not to object on that particular ground. And that is whether something is admissible is not dispositive of that question. Because admissibility is merely one factor that goes into the strategic calculation that counsel makes, for example. I'm glad you mentioned this, this goes to the question I asked Ms. Kemp, and you've now alluded to it, so let me ask you too. On the rect appeal, we don't know and we never know what defense counsel's analysis was or motivation or thinking or strategy or whatever. You've heard Ms. Kemp's argument. I don't know that you folks have discussed this in your briefs, which are otherwise really very good, as I mentioned earlier. What about as a possible resolution in this case, saying that we're not going to essentially guess at this point that we think the motivation analysis or understanding of defense counsel and her explanation or his explanation of it might be important, so I'll let you raise it on the PC. So what we would say is that Strickland doesn't require that. Strickland actually has a strong presumption, requires that the court indulge a strong presumption that counsel's decisions were made in a matter of reasonable strategy. Were they to raise it in a post-conviction petition, at the second stage, it's state we're moving to dismiss on exactly the same grounds that we've raised in our brief, that you presume it was strategic and that we have to provide any reasoning that would adequately support it, and I would maybe go to the third stage and hear counsel's testimony. That's only if it makes it past the second stage, and as your honor knows, many post-conviction petitions are dismissed at the second stage, even though they raise Strickland claims. And here, the record provides adequate basis to understand what a reasonable strategic reason would be not to raise the objections that defendant faults counsel for not raising. So specifically, we'll start with Britt. Britt gave his testimony. He said counsel confessed to these crimes, but he didn't remember a number of the details about what defendant told him. Now, there's no question that if he said, I can't remember, and they'd said, is your recollection exhausted? Would reviewing your prior recorded statement on this help you recollect it? They could have shown it to him, he could have read it, and then he could have testified if it refreshes recollection. And that's clear that, you know, just you made some reference to this, but there's a difference between present recollection refreshed and past recollection recorded. That's true. Present recollection refreshed, the way you do that is you give someone a statement, ask them to read it, say, is your recollection refreshed, take it away, and now you ask them questions. That's exactly right. To read from that statement. That's exactly right. So the question is not whether this was proper, it's whether trial counsel had a reasonable basis not to object to its impropriety. And here I would submit counsel did have a reasonable basis, because what was happening here, once it became clear, counsel objected at first, then there was a sidebar. And this, the prosecution said, Your Honor, what's happening is we asked him about statements of particular detail. He says, I don't remember it. We direct him to the transcript where he talked about it, and then he remembers. So it was a clear at that point that what the state's attorney was trying to do was to refresh his recollection. He was doing it improperly, but that was the goal. So at this point, counsel's presented with a question, what do I want to do about this? Because if I push it, then the state's attorney is likely to do exactly what Your Honor suggested, which is properly refresh his recollection by showing him the prior statement, having read it to himself, and then eliciting a live testimony after he's refreshed his recollection. That is arguably more harmful to defense, because the way the state's attorney was eliciting this testimony by confronting him with his prior statements had the flavor to the jury, at least, of impeachment. It made it look like Britt was not being forthcoming, that maybe he was not being truthful, and that is a more beneficial way for the jury to be exposed to this information than were it elicited after having refreshed his recollection. So counsel could have said, Look, this has kind of come in. I'd rather it come in this way. I want to try this, and your suggestion is that doing it this way might have proved less harmful from the defense than if they had objected and required the state to properly refresh the witness's recollection? That's exactly right. This had the optics of impeachment. And I have to remember that the defense's theory of the case was that these jailhouse informants are all liars. They're opportunists who made up these stories to try and get something for themselves. So to the extent that they can undermine the appearance of truthfulness of these witnesses on the stand, that's all to the good. This particular, I think there's an old saying, When your opponent is making mistakes, don't interrupt him. Here, the prosecution had chosen the least effective way of refreshing his recollection, the way that made him look most suspect. Because refreshing his recollection would say, and I think did in her brief, that there's no indication in this case that the state could have figured out how to do it any different or better. Well, and to this, I'd say, I mean, setting aside any anyone's particular views of the capabilities of the attorneys below, I would say that whether counsel's strategic decision was reasonable is always going to be based on speculation, right? Because counsel's making a decision in real time, if I take this action, what are the possible consequences? And so he has to make a judgment in the moment. What do I think will happen if I do this? And counsel could have reasonably decided, since they've already said we're trying to refresh his recollection, they're doing it poorly. And they're doing it in a way that doesn't appear to be well thought through. If I continue to press on this, it's going to force them to think it through, at which point, as your honor just did, they're almost certainly going to come to the correct conclusion, oh, I'm just refreshing his recollection, I'll just do it properly, rather than the way I'm doing it now. Counsel, is your argument as to Bell's testimony the same? Our argument to Bell's testimony is similar, but somewhat different. Bell's testimony, we're not saying that it was proper, it was not proper impeachment. But there, again, the defense's theory was that these witnesses are all liars. So any way that they can get that out is to the good. Bell had testified before he was improperly impeached with his prior inconsistent statement. He had testified that defendant admitted he was at the scene of the murders, that he had been paid in money and cocaine for the murders, and that he had been seen leaving the scene of the crime by an eyewitness. Now, he didn't testify, he did not, or he did not admit, rather, to Bell, that he actually pulled the trigger. For that part, he said that's what people are saying. He did not similarly distance himself from being at the scene from being paid for the murders. So he says, well, that's what people are saying. And then he tried to hire Bell to shoot the eyewitness who'd seen him leaving the scene of the crime. So at that point, that testimony is extremely harmful to the defense. The defense would like for this witness to look like he is not telling the truth. And just at that moment, the state says, we want to impeach you with your prior inconsistent statement. That is actually supportive of the defense's theory. Look, he can't even keep his story straight. He told them one thing, now he's telling them the other. This is all a pack of lies. He's making up things as it goes along, and so you can't believe him. It's certainly within, as Strickland puts it, the wide range of reasonable professional assistance for counsel to determine that, look, our theory is these guys are liars. Impeaching them with a prior inconsistent statement supports that theory. It is consistent with our overall theory that this is the case. Counsel, you only have a couple minutes left. I want to ask you this question because I want to be able to ask it to opposing counsel in rebuttal. But in her brief on page six, she says that Bryant was tried and convicted in federal court of these same murders. And then she gives a citation for Bryant at 750 F 3rd at 648 through 49. What am I to make of that? Is there something, that would be public record that this court needs to consider for purposes of deciding this case? I would say it's irrelevant to the consideration of this case because it wasn't in the record in this case. It was, it's, it's an extra record. I mean, it'd be like if a co-defendant were also convicted. I would say to the extent that it's relevant, I mean, Bryant, that Bryant was certainly involved in this case. Bryant's the one in the federal case. He wasn't, he convicted because he had made confessions and admissions. I believe so, but I don't, we're not, we're not entitled to know that when we decide this case and the gravity of it. I mean, our position is this court is restricted to the record on appeal and it can't go, go researching additional facts. We don't, we weren't party to, to the federal case. Okay. Well, then do you have any idea why it was cited in the brief, if that's the case? Well, I didn't sign it in your brief. Right. I think it was presumed. I can't speak to why counsel cited it. I would say that it's, it's not properly, and we noted in our brief that it's not properly before the court. The evidence presented in that trial was not presented in this trial. The jury in this case could not have considered that decision or any evidence. The statements used in federal court implicated defendant in this case, it doesn't make any difference. That's right. Okay. Thank you, counsel. Ms. Kim, any rebuttal? Counsel, before you start, would you follow up on what I just questioned the opposing counsel about and what your position is for having put it in the brief and whether anything in that federal case is something that we should consider because it's part of the, I guess, public record at this point. I don't know. I'm just asking. Pardon me. I have forgotten to unmute myself. Thank you, Justice Turner. I view a published Seventh Circuit decision as citable just as any other case would be to the extent that this court would disagree. You certainly could take judicial notice. Under the Illinois case law, a reviewing court may take judicial notice of a written decision that is part of the record in another court. The reason I provided it here is not because any of my arguments necessarily rely on it, but I thought it would aid the court in understanding the full factual context of who this person is because he is, Bryant is all over this record, but without a lot of explanation. And so I cited the Seventh Circuit decision for that purpose. Okay. It perplexes me just a bit. I accept your responses from both of you, but it seems as though, and I did review that case, that there were many admissions made that we're not privy to. And certainly, they may have been admissions that would have convicted Bryant, but may have something to do with your client's exposure in this case. But you've addressed it the best you can, so move on with your rebuttal. Thank you. One thing that I think is important. Before you get to your rebuttal question, I want to ask that came up from Mr. Schneider, and I want to make sure you address it. Because it concerns the thing I mentioned I was most concerned about, namely the limitations on the cross-examination of Mosley. Mr. Schneider, if I understand him correctly, says one of the difficulties with that issue on appeal is no offer of proof was made. So we don't know, had the objection been overruled or an offer of proof had been made, what the cross-examination of Mosley, largely unfettered cross-examination, let's assume, would have showed. Is he right that there was no offer of proof made? No. There was an offer. Certainly we don't know what the cross-examination would have shown, but we know what defense counsel was attempting to do because he made that very clear to the court in the sidebar. Well, yes, I agree. But the point of an offer of proof is not representations of lawyer, unless the court under the circumstances prepared to accept it was totally accurate, but instead to see what in fact the restricted testimony have permitted, questioning would have elicited. And in this case, you're right that everyone characterizes Mosley as really a bad guy and a criminal and all the rest. But do we really know what an unfettered cross-examination of Mosley regarding what he expected or what he was thinking would have revealed? No, but you don't need to know what Mosley would have said. If you conclude that the cross-examination was improperly restricted, that's a violation of my client's constitutional right to confront the witnesses against him. The state has to prove harmlessness beyond a reasonable doubt. So it's on the state to prove that whatever Mosley would have said wouldn't have been problematic to his credibility. The harmlessness factors are the importance of the witness's testimony to the state's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the witness's testimony on material points, the extent of cross-examination otherwise permitted, and the overall strength of the state's case. So what that cross-examination would have revealed is not the issue. The issue is that we never got to hear that, and most importantly, the jury never got to hear that. The jury was specifically told during closing argument that Mosley didn't have anything to gain. So not only was the jury deprived of the motive-relevant evidence, the jury was specifically told by the state's attorney that there was no motive-relevant evidence. If I may briefly respond I took up most of your rebuttal time, so I want to give you a chance to address other matters. Thank you. I think it's important to untangle the pre-trial rulings on the restriction on cross-examination because opposing counsel has quoted one pre-trial ruling, but immediately before jury selection began, there was a second statement by the court on that pre-trial ruling. The court said, quote, witnesses can be asked if they have been promised anything in exchange for their testimony, and that is it. So the court made that very unequivocal statement just before trial that the only thing relevant to motive was promises. So that context has to come with us into the moment when defense counsel was trying to question Mosley about his motive. It's also important to note that on direct testimony, Mosley himself muddied the waters on 749 by claiming that his sentence was shortened because he put in an appeal and won. So Mosley told the jury that his 20-year sentence was reduced dramatically because he won an appeal in his case. But the actual truth of the matter, as again exhibited in the timeline, is much more complex, and that's why defense counsel needed to get into the procedural history of 749 in order to show the jury the timing and the causal connections between what was happening in 749 and what Mosley was doing with regard to Harris. If there are no further questions. Okay, again, at the beginning of the argument, I complimented you both on your briefs. They were really very well done in this complicated case, and now I can add to that you both gave very effective arguments, and I thank you for that as well. And with that then, the court will take this matter under advisement and be in recess.